F. Ray MARSHALL, Secretary of Labor, Plaintiff,

v.

Arthur M. KELLY, Individually and as trustee and administrator of Mike Kelly Construction Company Profit Sharing Plan, Defendant.

No. CIV–78–0070–E.

United States District Court, W. D. Oklahoma.

Dec. 29, 1978.

Carin Ann Clauss, Sol. of Labor; Monica Gallagher, Associate Sol., Plan Benefits Security Div.; Norman P. Goldberg, for Litigation, Plan Benefits Security Div.; Robert N. Eccles, Atty., U. S. Dept. of Labor, Plan Benefits Security Div., Washington, D. C., John E. Green, Asst. U. S. Atty., Oklahoma City, Okl., for plaintiff.

Harvey L. Harmon, Sr. of Franklin, Harmon & Satterfield, Inc., Oklahoma City, Okl., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

EUBANKS, District Judge.

This action was brought by the Secretary of Labor on January 27, 1978 pursuant to 29 U.S.C. § 1132(a) against the defendant, Arthur M. Kelly, seeking relief for alleged violations of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* The defendant filed an answer denying any violations of ERISA and raising several affirmative defenses. Trial was had to the Court on December 4–7, 1978. The Court, having heard the evidence presented and read the briefs and findings and conclusions proposed by the parties, now makes the following findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

### FINDINGS OF FACT

1. The Mike Kelly Construction Company (the Company) is an Oklahoma corporation which, in the years relevant here, specialized in the construction of fast food restaurants. Prior to their merger into the Company in early 1975, two affiliated corporations, Mike Kelly Manufacturing Co. and Mi–Kel Corp., also operated aspects of the construction business. The defendant, Arthur M. Kelly (known as Mike Kelly), is the sole shareholder (with his wife) of the Company and also serves as its president and chairman of its Board of Directors.

2. On December 29, 1969, effective as of January 1, 1969, the Company established a Profit Sharing Plan (the Plan) for the benefit of its employees and employees of the

affiliated Mike Kelly companies. The Plan provides for annual discretionary contributions by the Company to a trust in an amount not to exceed the lesser of the Company's net profits or 15% of the total annual compensation paid by the Company. These employer contributions—along with forfeitures, any voluntary contributions by employees, and all income of the trust—are allocated annually to participants' individual accounts. Benefits equal to all or a part of the individual account balance are payable to a participant who terminates employment with the Company; the Plan's vesting schedule provides for partial vesting after two years of service, increasing by steps to full vesting after six years. At the end of 1976, the Plan had total assets, valued at cost, of $376,215.90; as of October 1, 1978, its assets were $235,240.16. The number of participants in the Plan has ranged from 95 in 1974 to 11 in 1978.

3. The defendant has served continuously as a trustee of the Plan since its inception and has been the sole trustee since early 1976. The defendant is the only member of the Plan Committee which is responsible for administration of the Plan.

4. On May 16, 1972, the Plan made a loan of $33,000 to the Company. On February 22, 1974 and May 22, 1974 the Plan made additional loans to the Company of $50,000 and $100,000, respectively. Each of these loans was originally for a one-year term, but was renewed annually on its due date by the defendant on behalf of the Plan. The loan notes in evidence show that the $33,000 loan bore 12% interest in 1974 and 8% in 1976; that the $50,000 loan was made at 10% interest in 1974, and renewed at 10% in 1975 and 8½% in 1977; and that the $100,000 loan was made at 12% in 1974 and renewed at 10% in 1975 and 8% in 1976. The defendant testified that these interest rates were comparable to those paid by the Company for its bank financing, except that the Plan's rate may have dropped as much as a point below the bank rate when the Company was financially distressed. Subsequent to the filing of this action, the interest rates on each of these loans was raised to 10%.

5. In the period after the loans from the Plan were made, the financial condition of the Company declined significantly. Robert VanDeventer, who was Controller of the Company, testified that, because of this decline, he had doubts by late 1975 about the Company's ability to repay the loans from the Plan both over the short and long terms. The defendant admitted that there had been a time when the Company, in fact, could not have repaid the loans.

6. In connection with these loans, the Plan and the Company entered into a security agreement which provided that the Company's "qualified accounts receivable" would secure all outstanding loans between the Plan and Company. Paragraph 2 of that agreement provided that the unpaid principal of all outstanding loans "shall not exceed" 66⅔% of the value of these "qualified accounts receivable". The defendant testified that he was not familiar with the terms of the security agreement, although he signed it on behalf of both the Plan and the Company.

7. The Plan's security interest in the Company's accounts receivable was recorded by filing of a UCC–1 financing statement on March 4, 1974 securing "all debtors trade accounts receivable". On March 15, 1974, 11 days after the Plan's security agreement was entered into, a financing statement was filed by the First National Bank of Bethany which covered all of the Company's "accounts receivable now existing and which hereafter come into existence". Although the Plan and the Bank were the two major sources of the Company's financing, and although the defendant signed both financing statements, he testified that he was unaware of this simultaneous pledging of the same assets to secure two obligations.

8. Accompanying the deterioration of the Company's finances was a decline in the value of the Company's accounts receivable which secured the loans from the Plan. The total value of the Company's accounts receivable dropped and remained below the $274,500 value of the accounts which was

required to secure $183,000 of loans under the terms of the security agreement, thus jeopardizing the sizeable percentage of the Plan's assets invested in these loans. In addition, these accounts did not satisfy the definition of a "qualified" account under the security agreement. The defendant testified that he had never seen any schedules or certificates as to the value of the accounts receivable, and there was no evidence that such schedules were available as contemplated by paragraph 4 of the security agreement.

9. While the loans from the Plan to the Company were secured only by the Company's accounts receivable, the bank loans to the Company were also secured by the defendant's personal guarantee and a pledge of securities held by him personally. Although the principal balance due on Plan loans remained almost constant in amount, the defendant agreed to reduce the principal balance of the bank loans and to repay them fully prior to repayment of the Plan's loans. Principal repayments by the Company brought the balance of the Bank loans from around $660,000 in 1975 to about $160,000 in 1978 with further reduction and full repayment to be made from payments for completed construction jobs.

10. Article VIII, Paragraph 8.12 of the Plan document then in effect provided that loans to Plan participants shall be made on interest-bearing notes and that such loans "shall not exceed 75% of such participant's vested interest" in his employer contribution account "determined as of the last preceding plan anniversary date." As of December 31, 1974, the defendant was 80% vested in an account balance of $31,479.67 for a vested total of around $25,200. Even assuming that all of this total was in the employer contribution account as required under Article VIII and not attributable to forfeitures or voluntary contributions, the maximum amount loanable to the defendant under the Plan in November 1975 was 75% of $25,200 or $18,900. On September 3, 1975, the defendant received an $18,000 loan from the Plan which is still outstanding. The total principal amount of all loans from the Plan to the defendant is greater than the total amount of the Plan's loans to all other participants.

11. The defendant testified that, following the passage of ERISA, he was aware that the Plan was prohibited from making any new loans to the Company. On November 17, 1975, the defendant caused the Plan to make a $60,000 loan to himself and used the proceeds of this loan in the Company's business. Robert VanDeventer, former Controller of the Company and co-trustee of the Plan, testified, without refutation by the defendant, that he was instructed by the defendant to write a check for $60,000 to the defendant. He wrote the check but refused to sign it and advised the defendant that such a loan would be unlawful under ERISA. The defendant responded "If the house is on fire, you grab the nearest bucket of water" and signed and endorsed the Plan's check which was then deposited to the Company's bank account. The loan was repaid, with interest, three months later.

12. Bill Weaver is a personal and business acquaintance of the defendant and operates an insurance agency which writes insurance for the defendant and his business entities. In November 1975, Mr. Weaver approached the defendant for a loan and was granted a $25,000 loan from the Plan. This loan was made at the direction of the defendant despite a warning relayed from the Plan's attorney concerning the legality of the loan under ERISA. No loan note is in evidence, but the evidence does show that the loan was made at 8% interest and was not collateralized. The principal of this loan was repaid in January 1976 although it does not appear that any interest was paid. The defendant testified that Mr. Weaver had offered to pledge real estate as collateral for the loan, but that he turned the offer down.

On March 4 and May 5, 1976, the defendant as sole trustee caused the Plan to make new loans of $25,000 and $10,000 to Mr. Weaver. These loans were evidenced by notes, bearing interest at 8% without any security or collateral. The loans were for three month terms and were renewed on

their due dates. By the time that the defendant and his attorneys were notified of the Department of Labor investigation in mid-March 1977, Mr. Weaver had paid only a small portion of the interest accrued on these notes and had made no principal payments. The defendant and Mr. Weaver then reached an understanding, confirmed by letter of March 28, 1977 that the $25,000 loan would be repaid in full on June 1, 1977 and the $10,000 loan on August 1. The loans were, however, renewed again. Periodic reductions in principal were made, and the loans were repaid in full after this action was filed.

13. At about the same time as the unsecured loans from the Plan to the defendant and Mr. Weaver, participants in the Plan also borrowed from the Plan on the security of their vested benefits. The Plan's check register shows that in late 1975 while Mr. Weaver was receiving his unsecured loan at 8% and Mr. Kelly was receiving two loans at 10%, loans were made at 12% interest to a number of participants. Subsequently, while the unsecured loans to Mr. Weaver were renewed at 8%, participants borrowed on notes secured by their vested benefits at 10% interest. In only one instance (see Defendant's Exhibit 21) was a participant allowed such a favorable rate of interest on money borrowed from the Plan.

14. In January 1972, the Plan purchased a parcel of land near 23d and Rockwell Streets in Bethany, Oklahoma for $28,957. The Plan entered into a lease with a subsidiary of Pizza Hut, Inc., the national parent company, which provided for a 15 year lease (with two 5 year renewals) of a restaurant to be constructed on the land with a minimum annual rental of $10,800 plus the excess of 7½% of the restaurant's gross receipts over $10,800. The restaurant, constructed for the Plan by the Company, opened for business on April 4, 1972. On April 7, 1972 and May 12, 1972, the Plan made payments of $35,000 and $6,400 to the Company for the costs of construction of the restaurant building.

15. The leasing of the Pizza Hut proved lucrative to the Plan which annually received both the minimum rental and overage payments. In July 1976, the defendant proposed the sale of the restaurant to Pizza Hut, Inc. in a letter which concluded: "A sale of this nature would not be near as attractive to me, if in fact the administration of my Profit Sharing Trust wasn't becoming so cumbersome. I would like to reach a liquid state and clear myself personally of the responsibility". On September 1, 1976, the Plan sold its Pizza Hut to Pizza Hut, Inc. for $150,000.

16. From the proceeds of this sale, the defendant caused the Plan to issue a check for $9,000 to a personal entity, the Mike Kelly Trust, as a 6% sales commission to himself for sale of the Pizza Hut. Prior to issuance of this check there was no written agreement or other document or oral contract which provided for payment of such a commission. The defendant testified that his role in negotiating the sale represented extraordinary services to the Plan. In 1976, the defendant worked full-time for the Company and received a salary which, although reduced from prior years, totaled about $30,000.

17. Also from the sales proceeds of the Pizza Hut, the defendant caused the Plan to issue a check for $45,000 to the Company for claimed additional construction costs allegedly incurred in construction of the Pizza Hut for the Plan in 1972 but never paid to the Company. There was considerable testimony at trial which attempted to estimate the construction costs of this Pizza Hut, and there is evidence which would sustain a finding that the costs were in excess of the $41,400 paid by the Plan in 1972. However, for the following reasons, the Court finds that it was the intent of the parties in 1972 that the $41,400 represent full payment to the Company and that no additional payments by the Plan were owing:

a. There was never any note, agreement, or other document which provided for additional payments by the Plan to the Company in excess of the $41,000 already paid. Financial records of both the Plan and the Company did not reflect any debt owing for additional payments. The de-

fendant conceded that there is no document which reflects the existence of such a debt.

b. Having seen the defendant testify at length at trial, the Court is able to observe that Mr. Kelly is an astute businessman who is meticulous in all his business affairs, including recordkeeping. He testified that in a normal construction job, there would be a construction contract which would show the contract price, a contractor's affidavit to show the price on completion after change orders, and ledgers with running totals kept monthly and even more frequently showing costs charged to various aspects of the job as they were actually incurred. None of these records were maintained on the job for the Plan. In addition, the defendant testified that the job file on the Plan's Pizza Hut was "very, very weak" on information about the actual costs, that there were no bills for such major items as the claimed site work, and that he therefore had no idea what the actual costs were. This complete absence of cost records demonstrates to the Court that this was not a normal, arm's length job in which the Company intended to receive a full profit and reimbursement of all costs.

c. Not only is there a complete absence of records which would justify and support the additional $45,000 payment but also the few cost summaries maintained on this job positively demonstrate an intent that the Plan pay only approximately $41,400, i. e. the amount actually paid in 1972. The Cost Analysis sheet on this job totals to $39,168; the unfilled blanks in this sheet, except for profit, are relatively minor items which would not bring the costs out of that range. Likewise, the Application for a Building Permit estimated the costs of this job at $42,000. Finally, the building was carried on the Plan's tax returns at a cost of $40,015.

d. Also persuasive to the Court is direct testimony from former officials of the Company which the defendant did not attempt to directly refute in his testimony. Robert Carver, Jr., a former Plan trustee and former Director of Operations of the Company who supervised part of the construction of the Plan's Pizza Hut, testified that an effort had been made to keep the costs down on this job in order to increase the return to the Plan on the lease which was signed prior to construction. Mr. Carver also testified to statements by the defendant that his intent had been to build the Pizza Hut at cost and with no profit to the Company in order to increase the Plan's return. Robert VanDeventer, former Plan trustee and Controller of the Company, also testified to the defendant's statements that the Pizza Hut had been intentionally built cheaply with no expectation of profit to the Company.

e. In a letter dated February 18, 1972, the defendant wrote that the already negotiated lease would allow the Plan "approximately a 14% return for their investment". The defendant sought to explain away this letter at trial by testifying that the 14% figure included the additional return from both the overage on sales and the effect of depreciation. Neither of these factors, however, is included in the return formula which the defendant presented to the Court. In the February 18 letter, the depreciation factor is referred to separately from the 14% return, and the sales overage is not even mentioned. Accordingly, the Court finds that this letter is also strong, contemporaneous evidence of an intent to have the Plan earn approximately a 14% return, a figure which would place the building costs in the high forty thousand dollar range.

f. Finally, the intent of the parties is also conclusively shown by the absence of any credible explanation as to why, if additional costs were owing, they were not collected either in 1972 or in the intervening years before 1976 when the Plan had sufficient liquid assets to make $183,000 in loans to the Company. The defendant testified at trial (and conceded that he had so testified several times at his deposition) that the additional costs had not been paid in 1972 solely because the Plan had no more money after it paid the $41,400 to the Company. However, financial records of the Plan show that on May 12, 1972 when the Plan made its second and last payment to the

Company of $6400, it still had over $16,000 in its bank account. These records also show that three or four days later on May 15 or 16, 1972, the Plan received a contribution of over $17,000, apparently from the Mi–Kel Corp., bringing its total bank balance to around $34,000. Most of this money was then loaned to the Company on May 16, 1972 as the original $33,000 loan. Thus, the Plan had sufficient liquid assets in May of 1972 to satisfy most of the alleged debt. Its lending of money to the Company is completely inconsistent with the claim that the Plan owed money to the Company and by itself warrants the Court's finding that the $41,400 was intended to be final payment of all debts owed by the Plan to the Company in connection with the construction of the Plan's Pizza Hut.

g. Other reasons militating against any idea that defendant would be entitled to any of the proceeds from the sale of the Pizza Hut were dictated into the record by the Court at the close of the evidence.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action under Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1). Venue of the action is proper in this district under Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2). The Secretary of Labor has authority to bring this action under Sections 502(a)(2) and (5) of ERISA, 29 U.S.C. § 1132(a)(2) and (5).

2. The Mike Kelly Construction Company Profit Sharing Plan (the Plan) is an employee pension benefit plan within the meaning of Section 3(2) of ERISA, 29 U.S.C. § 1002(2), which is maintained by an employer engaged in an industry affecting commerce within the meaning of Section 4(a)(1) of ERISA, 29 U.S.C. § 1003(a)(1).

3. At all times since the effective date of ERISA, the defendant, Arthur M. Kelly, has been a fiduciary with respect to the Plan within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

4. ERISA has recently been described by the Court of Appeals for the Tenth Circuit as a comprehensive remedial statute designed to protect the interests of participants in employee benefit plans and their beneficiaries by, among other ways, establishing standards of conduct for fiduciaries of such plans and providing appropriate remedies for breaches of such standards, *Eaves v. Penn,* 587 F.2d 453, 457, 10th Cir., 1978, *aff'g* 426 F.Supp. 830 (W.D.Okla., 1976); § 2(b) of ERISA, 29 U.S.C. § 1001(b). The objectives of ERISA's fiduciary provisions, as described by Senator Williams who was a chief sponsor of ERISA, are

> "to make applicable the law of trusts; . . . to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets; and to provide effective remedies for breaches of trust." U.S.Code Cong. and Admin. News, pp. 4639, 5186, 93d Cong., 2d Sess., 1974.

Like other legislation with remedial objectives, ERISA should be given a broad construction in order to carry out its purposes of protecting the interests of Plan participants and beneficiaries and preserving the integrity of Plan assets. See *Marshall v. Snyder,* 430 F.Supp. 1224, 1231 (E.D.N.Y. 1977), aff'd 572 F.2d 894, 901 (2d Cir. 1977); *Tennessee Coal Co. v. Muscoda Local No. 123,* 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944) (Fair Labor Standards Act).

5. Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1), provides that

> "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an emterprise of a like character and with like aims;

**350**

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title."

As the Court of Appeals has recently stated, this section embodies the "central and fundamental obligation imposed on fiduciaries by ERISA" and contains

"a carefully tailored law of trusts, including the familiar requirements of undivided loyalty to beneficiaries, the prudent man rule, the rule requiring diversification of investments and the requirement that fiduciaries comply with the provisions of plan documents to the extent that they are not inconsistent with the Act." *Eaves v. Penn*, supra.

■ 6. The defendant failed to discharge his duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of Plan administration as required by Section 404(a)(1)(A) of ERISA, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, as required by Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B) in that:

a. He caused the Plan to renew the $183,000 in loans to the Company which he owned, despite the declining financial condition of the Company, the declining value of the security on the loans, the Company's breaches of the security agreement, and the fact that the loans constituted an increasingly large share of the Plan's assets so that the risk of large losses was not minimized as required by 29 U.S.C. § 1104(a)(1)(C). He failed to take any steps to secure repayment of the loans or to protect the Plan's rights under the loan and security agreements.

b. He caused the Plan to make the $60,000 loan to himself at a lower interest rate and with less security than the Plan obtained on contemporaneous loans to other participants and despite the fact that loan was not in accordance with the lawful provisions of the document governing the Plan as required by 29 U.S.C. § 1104(a)(1)(D).

c. He caused the Plan to make and renew the loans to Bill Weaver, a personal and business acquaintance, at lower interest rates and with less security than the Plan was obtaining on contemporaneous loans to participants, and he failed to pursue timely repayment of the interest and principal on these loans.

d. He caused the Plan to pay himself a $9,000 sales commission while serving as a Plan trustee despite the lack of any obligation on the Plan to pay such a commission.

e. He caused the Plan to pay the $45,000 in additional construction costs to the company despite the lack of any obligation on the Plan to make such a payment and despite defenses which the Plan could have raised if the Company had attempted to collect such a payment.

■ 7. The obligations imposed by Section 404(a) of ERISA are supplemented by the provisions of section 406, 29 U.S.C. 1106, which prohibit a fiduciary from taking certain actions. Section 406(a)(1) provides in pertinent part, subject to certain exemptions, that:

"(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should have known that such transaction constitutes a direct or indirect—. . .

"(B) lending of money or other extension of credit between the plan and a party in interest . . .

"(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; . . ."

In short, Section 406(a) prohibits transactions between a plan and certain parties in interest.

8. The Company is a party in interest to the Plan within the meaning of Section 3(14)(C) of ERISA, 29 U.S.C. § 1002(14)(C), because it is an employer whose employees are covered by the Plan. The defendant himself is also a party in interest to the Plan because he is a fiduciary with respect to the Plan, the owner of more than 50% of the stock of the employer sponsor, and an employee, officer, director and 10% or more shareholder of the employer sponsor; Sections 3(14)(A), (E), and (H) of ERISA, 29 U.S.C. § 1002(A), (E), and (H).

9. Section 406(a) of ERISA prohibits a fiduciary from causing a plan to enter into transactions with parties whom "he knows or should have known" are parties in interest to the Plan. A fiduciary must act with prudence in investigating whether a party in interest relationship exists. As the Conference Report on ERISA states:

> "The type of investigation that will be needed to satisfy the test of prudence will depend upon the particular facts and circumstances of the case. In the case of a significant transaction, generally for a fiduciary to be prudent he must make a thorough investigation of the other party's relationship to the plan to determine if he is a party-in-interest. In the case of a normal and insubstantial day-to-day transaction, it may be sufficient to check the identity of the other party against a roster of parties-in-interest that is periodically updated." H.R.Rep. 93–1280, Cong., 2d Sess. at p. 307; 1974 U.S.Code Cong. and Admin.News at p. 5087.

In this case, because significant transactions were involved and because the party-in-interest affiliations were obvious, the Court concludes that the defendant knew or should have known that he and the Company were both parties in interest to the Plan.

10. The defendant caused the Plan to engage in transactions which he knew or should have known constituted a direct or indirect lending of money or other extension of credit between the Plan and a party in interest in violation of Section 406(a)(1)(B) of ERISA, 29 . U.S.C. § 1106(a)(1)(B), in that:

a. He caused the Plan to renew the outstanding loans to the Company.

b. He caused the Plan to make the $60,000 loan to himself.

11. The defendant caused the Plan to engage in transactions which he knew or should have known constituted a direct or indirect transfer, or use by or for the benefit of, a party in interest, of any assets of the Plan in violation of 29 U.S.C. § 1106(a)(1)(D) in that:

a. He renewed the outstanding loans to the Company, thus allowing continued use of Plan assets by the Company.

b. He caused the Plan to make the $60,000 loan to himself for the purpose of providing capital to the Company, thus transferring plan assets to himself for the use and benefit of both himself and the Company.

c. He caused the Plan to transfer $9,000 of its assets to himself for the "sales commission."

d. He caused the Plan to transfer $45,000 of its assets to the Company for the "additional construction costs."

12. Section 406(a) of ERISA expressly provides that its prohibitions are subject to the exemptions provided in Section 408 of ERISA, 29 U.S.C. § 1108. Section 408(b)(1), 29 U.S.C. § 1108(b)(1), exempts from the provisions of Section 406(a)(1):

> "Any loans made by the plan to parties in interest who are participants or beneficiaries of the plan if such loans (A) are available to all such participants and beneficiaries on a reasonably equivalent basis, (B) are not made available to highly compensated employees, officers, or shareholders in an amount greater than the amount made available to other employees, (C) are made in accordance with specific provisions regarding such loans set forth in the plan, (D) bear a reasonable rate of interest, and (E) are adequately secured."

At the time of the $60,000 loan to the defendant, the defendant was a participant

in the Plan and the Plan document did permit loans to participants under the conditions set forth in Finding of Fact No. 10, supra. The $60,000 loan was in an amount which exceeded the limits set forth in the Plan document and thus did not satisfy Section 408(b)(1)(C). In addition, even assuming that the defendant's vested benefits secured this loan, those benefits were not in an amount which constituted adequate security under Section 408(b)(1)(E). Since the loans to the defendant exceeded the total of loans to all other participants, this loan did not meet the criteria of Section 408(b)(1)(B). Finally, since other participants were required to provide greater security for their loans, the loans to the defendant were not made on a reasonably equivalent basis to loans to other participants as required by Section 408(b)(1)(A). Thus, Section 408(b)(1) provides no exemption for this loan.

13. Section 408(c)(2) of ERISA, 29 U.S.C. § 1108(c)(2), provides that Section 406 shall not be construed to prohibit a fiduciary from

"(2) receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan; except that no person so serving who already receives full-time pay from an employer or an association of employers, whose employees are participants in the plan, or from an employee organization whose members are participants in such plan shall receive compensation from such plan, except for reimbursement of expenses properly and actually incurred; . . . ."

The defendant has contended that his services in negotiating the Pizza Hut sale were not part of a normal trustee's duties but were "extraordinary services)" which should be separately compensated; if this were true, the section 408(c)(2) exemption would not apply since it exempts only compensation for services provided by a fiduciary in the performance of his fiduciary duties with the Plan. If, however, the negotiation of the Pizza Hut sale was merely part of the defendant's fiduciary duties for the Plan, the Section 408(c)(2) exemption is inapplicable by its terms since the defendant was, at the time of the sale, receiving full-time pay from the Company which was an employer of employees covered by the Plan. See also, 29 C.F.R. § 2550.408c–2(b)(2). In either case, Section 408(c)(2) provides no exemption from Section 406(a) for payment of the $9,000 "sales commission."

14. Section 408(b)(2) of ERISA, 29 U.S.C. § 1108(b)(2), exempts from the prohibitions of Section 406(a)

"(2) Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting or other services necessary for the establishment or operation of the plan if no more than reasonable compensation is paid therefor."

The Plan entered into no contract or arrangement for services which contemplated payment of the $9,000 "sales commission" or the $45,000 in "additional construction costs" and thus, Section 408(b)(2) provides no exemption for those payments. Also, since the Plan was represented in the Pizza Hut sale by a fiduciary who was already receiving full-time pay from an employer, the "commission" was not reasonable compensation. 29 C.F.R. § 2550.408c–2(b)(2). Likewise, the $45,000 payment was not reasonable compensation since the $45,000 in additional costs were not, in fact, owing.

15. Section 414(c)(1) of ERISA, 29 U.S.C. § 1114(c)(1), provides:

Sections 406 and 407(a) relating to prohibited transactions shall not apply—

"(1) until June 30, 1984, to a loan of money or other extension of credit between a plan and a party in interest under a binding contract in effect on July 1, 1974 (or pursuant to renewals of such a contract), if such loan or other extension of credit remains at least as favorable to the plan as an arm's-length transaction with an unrelated party would be, and if the execution of the contract, the making of the loan, or the extension of credit was not at the time of such execution, mak-

ing, or extension, a prohibited transaction (within the meaning of section (b) of the Internal Revenue Code of 1954 or the corresponding provisions of prior law);"

The $183,000 in loans from the Plan to the Company were made under binding contracts in effect on July 1, 1974 which were renewed after ERISA became effective. However, these loans have not remained at least as favorable to the Plan as arm's-length transactions would be. Prior to ERISA in 1974, the borrower on these loans, the Company, had a good current financial position, and the Plan was apparently well secured by the assignment of the Company's accounts receivable. By the time of the renewals, however, the Company's finances had taken a severe downturn, the value of the security had diminished to well below the amount of the loans, and the provisions of the security agreement were completely ignored. Despite this significantly increased risk of loss of a major part of its assets, the Plan received neither additional security nor any increased return; to the contrary, the interest rates on the loans dropped until this suit was filed, and the defendant himself testified that the Plan may have received as much as a point below the bank rate in 1977. In short, the Plan originally negotiated these loans to be as favorable as arm's-length transactions. After the effective date of ERISA, the protections afforded to the Plan diminished significantly and the Plan received no offsetting advantages. Thus, the loans did not remain at least as favorable as arm's-length transactions, and they do not qualify for the transitional exemption provided by Section 414(c)(1).

**16.** Sections 406(b)(1) and (2) of ERISA, 29 U.S.C. § 1106(b)(1) and (2), provide that:

"(b) A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries . . ."

The defendant dealt with Plan assets in his own interest in violation of 29 U.S.C. § 1106(b)(1) in that:

a. He caused the Plan to renew the loans to the Company which he owns.

b. He caused the Plan to make the $60,000 loan to himself.

c. He caused the Plan to make the $45,000 payment to the Company.

d. He caused the Plan to make the $9,000 payment to himself.

**17.** A party who is a borrower from a plan or who is claiming payment from a plan will, by definition, have interests "adverse" to the interests of the Plan. The defendant acted in transactions involving the Plan on behalf of parties with interests adverse to the Plan's in violation of 29 U.S.C. § 1106(b)(2); in that:

a. He represented the Company in the renewals of the loans from the Plan, as evidenced by his signing the renewal documents on behalf of both parties.

b. He arranged a $60,000 loan from the Plan to himself.

c. He arranged $45,000 in payments to the Company.

d. He arranged the $9,000 payment for himself.

18. For the reasons discussed in Conclusion 13, supra, Section 408(c)(2) of ERISA provides no exemption, on the facts of this case, from the prohibitions of Section 406(b). For the reasons discussed in Conclusion 15, supra, the limited transitional exemptions set forth in Sections 414(c)(1) and (4) of ERISA do not, on the facts of this case, provide an exemption from the prohibitions of Section 406(b).

**19.** Section 408(b)(2) of ERISA, 29 U.S.C. § 1108(b)(2), provides no exemption from the provisions of Section 406(b). Although the language of Section 408(b)(2) appears to provide an exemption from all of the prohibitions of Section 406, a closer look at the statutory language and purpose has led the Department of Labor to the position

expressed in an interpretative regulation, 29 C.F.R. § 2550.408b–2(a) and (e),. that Section 408(b)(2) provides no exemption from the provisions of Section 406(b). Since this construction by the agency charged with the enforcement of ERISA resolves inconsistencies in the statutory language and preserves a fundamental purpose of ERISA, i. e. to prevent a fiduciary from acting in matters in which he has an interest which might affect his judgment, this Court should give it great weight, *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). In addition, the Court has itself reviewed the statutory language and legislative history and has independently concluded that Section 408(b)(2) should not be construed to provide an exemption from the prohibitions of Section 406(b).

20. The defendant has contended that any violations of ERISA which occurred were "hyper-technical" and caused no harm to the Plan. The Court does not agree with this characterization, especially as to the $9,000 and $45,000 payments; those monies were actually taken from the Plan. Harm has also resulted and is still resulting to the Plan to the extent that the Loans at issue represent an unjustifiably risky investment of the Plan's assets. However, the question of whether ERISA has been violated does not depend on whether any harm results from the transaction. Congress was concerned in ERISA to prevent transactions which offered a high potential for loss of plan assets or for insider abuse; the fact that a prohibited loan is or may be ultimately repaid does not render the loan lawful.

21. To the extent there is any uncertainty as to the Plan's liability for additional payment to the Company, the defendant plan trustee was responsible for creating the uncertainty; he was in a position to create contemporaneous documentation of any Plan liability and it was he who created the situation in which it is difficult to determine whether additional payments for construction costs were ever owing from the Plan to the Company. If a trustee fails to keep adequate records of the trust's investments and its obligations, thereby creating doubt as to which investments are his personally and which belong to the trust, a court will resolve the doubts in the manner most favorable to the trust. II Scott on Trusts, § 179.3. Likewise, any doubts which exist here as to whether a debt is owing should be resolved in favor of the Plan.

22. The Court, having found that the defendant has violated his fiduciary duties with respect to the Plan has broad discretion in awarding equitable relief to make the plan whole, including rescission of unlawful transactions and recovery of monies lost to the plan. *Eaves v. Penn,* supra, 587 F.2d 461–463, Section 409 of ERISA, 29 U.S.C. § 1109.

23. The loans from the Plan to the Company having been found to be unlawful under ERISA are ordered repaid.

24. The payments of $9,000 and $45,000 by the Plan to the defendant were improper and defendant is ordered to repay said sums to the Plan with interest from September 1, 1976 at the rate of 10%, and repayments of same are to be made forthwith.

25. Although counsel for defendant characterizes the several breaches of his fiduciary duty as are mentioned in the foregoing findings as being only technical, this Court concludes that they are substantial and should be concluded to be *malum in se* rather than merely *malum prohibitum.*

26. The Court concludes that defendant should be and hereby is forthwith removed as trustee of the Plan and may not resume such fiduciary capacity until he has fully repaid the sums mentioned in Conclusion 23 hereof and until he has fully repaid all loans obtained from the Plan either on his own behalf or on behalf of the Mike Kelly Construction Company or any other legal entity headed by defendant. Repayment hereunder shall be made no later than the current due date of the notes evidencing said loans.

No renewal of any note or other outstanding obligation to the Plan may be made unless same is clearly in keeping with ERISA law and rules and regulations there-

under promulgated. The Court will appoint three trustees to supervise and manage the Plan during the interim period until defendant becomes eligible to resume his position. The Court requests that counsel attempt to agree on the names of disinterested trustees to be appointed and directs that their names be provided in the judgment of the Court. In the event counsel cannot agree upon interim trustees, the Court will appoint same on a date to be fixed for final settlement of judgment herein and may or may not adopt suggestions made by the parties.

27. Counsel for plaintiff will prepare a formal judgment in keeping herewith, have same approved as to form by defense counsel and submit same to the Court for signature and filing within fifteen (15) days from this date. If counsel cannot agree upon the form of such judgment, the Court shall be notified and a date will be fixed for settlement thereof.

The Clerk of the Court will mail a copy hereof to counsel of record.