Raymond D. **MAHONEY**, Plaintiff, Appellee,

v.

**UNION LEADER RETIREMENT PROFIT SHARING PLAN et al.,** Defendants, Appellees.

**Union Leader Corporation, Defendant, Appellant.**

**No. 80–1316.**

United States Court of Appeals, First Circuit.

Argued Sept. 11, 1980.

Decided Dec. 5, 1980.

Ralph Warren Sullivan, Hingham, Mass., with whom Gregory V. Sullivan, and Malloy & Sullivan, Hingham, Mass., were on brief, for defendant, appellant.

Samuel W. Halpern, Atty., Plan Benefits Sec. Division, U.S. Dept. of Labor, Washington, D.C., with whom Carin Ann Clauss, Sol. of Labor, Monica Gallagher, Associate Sol., Norman P. Goldberg, for Litigation, and Edward A. Scallet, Atty., Plan Benefits Sec. Division, Office of the Sol., U.S. Dept. of Labor, Washington, D.C., were on brief, for defendant, appellee, Ray Marshall, Secretary of the United States Dept. of Labor.

Alan P. Cleveland, Manchester, N.H., with whom Sheehan, Phinney, Bass & Green, Prof. Ass'n, Manchester, N.H., was on brief, for plaintiff, appellee Raymond D. Mahoney.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, NELSON, District Judge.*

---

* Of the District of Massachusetts, sitting by designation.

COFFIN, Chief Judge.

This is an appeal from an order of the district court for the District of New Hampshire interpreting its own prior order requiring the sale of stock of defendant Union Leader Corporation, held by the Union Leader Retirement Profit Sharing Plan.[1] In earlier stages of this litigation mismanagement of Plan investments was alleged, including a charge of misrepresenting the value attributed to Union Leader stock held by the Plan. A consent decree was entered into under which an independent investment manager was to have sole responsibilities for selling the Union Leader stock and, indeed, of managing all Plan assets. The narrow issue posed here is whether legal and broker fees associated with the sale ($6,183.95 and $75,250, respectively) should be charged to the Plan or, as the district court held, to the Corporation.

The question is whether there was enough ambiguity in the consent decree and enough indicia of an intent by the parties not to charge the Plan to support the court's final conclusion. We see no clearly erroneous factual finding and no error of law. We affirm.

The strongest argument advanced by the Corporation is that the consent decree provides that in adjusting the accounts of all Plan participants upon the sale of the stock, "The sum of the aggregate adjustments shall not exceed the excess of the net proceeds from the sale over the valuation of the stock . . . as of September 30, 1978." The appellees attempt to blunt the force of this language by reading it as "the net over the carrying value" and "the difference between the sale price of the stock and its value as carried on the Plan's books." This is at best a strained interpretation and properly played no part in the district court's decision.

However, several other aspects of the decree together with subsequent develop-

---

1. The corporation is a defendant and the appellant. Appellees include Plan participants (plaintiffs below), the Plan (a defendant below), and the Secretary of Labor.

ments suffice to overcome the Corporation's argument. In the first place, the consent order itself, in its first operative paragraph, specifies that the independent investment manager of the Plan "shall be compensated by the Corporation consistent with industry practices." As the exclusive reference to compensation in the order, and as a complete self–contained provision, the paragraph may reasonably be read to suggest that it encompasses all costs and fees to be paid, and thus indicates that no other compensation from a different source was intended. Of more weighty import is the investment agreement shortly reached between "Loeb, Trustee" as client and Hutton, a comprehensive document covering all legal relationships between Hutton and its client concerning the former's management, with "complete discretion", of the investment of "the Client account", i. e., the Plan assets. Hutton was to execute all securities transactions, acting "solely as Client's agent", and was to "receive no compensation, except as set forth in Paragraph 10 below for such execution services". Where the law required a transaction to be executed through a floor broker unaffiliated with Hutton, Hutton was to "arrange for such execution at no additional cost to Client and provide all other services described herein for the fees described below in Paragraph 10." The Client agreed to pay "all transfer taxes, exchange fees mandated by the Securities Exchange Act of 1933 and any other charges imposed by law with regard to any transactions in Client's account". Finally, in Paragraph 10 itself, in return for Hutton's services the Client agreed to pay fees according to a fee schedule, which were set an annual rate of 1 percent on the first $500,000, 8/10 percent on the next $500,000, and 6/10 percent on the excess above $1,000,000, payments to be made quarterly.

The sweep of authority over management of the Plan assets given Hutton; Hutton's

limitation of compensation to the fee schedule based on asset market value; the assumption by the Client of the obligation to pay specified fees and all transaction charges imposed by law; and Hutton's undertaking to obtain, where necessary, another qualifying floor broker at no additional cost all these provisions described a relationship in which Hutton was charging for its services solely the costs specifically identified, costs which in turn, it is undisputed, were to be charged to the Corporation under the consent decree.

In addition to the thrust of the investment agreement, there are other straws in the wind pointing in the same direction. Under Article III of the consent decree Hutton was obligated, as part of its mandate to sell the Union Leader stock "in a manner both consistent with its fiduciary responsibilities and commercially reasonable", to "notify the parties to this action of the method selected to dispose of the stock and conditions of such disposition". Hutton's notice confined itself to describing its efforts to stimulate interest, deposit and check requirements, and conduct of negotiations and determination of the prevailing bidder at the sale. It made no mention of any expectation that legal and brokerage fees would be a charge on the sales proceeds. Whether or not the notice given would be generally adequate, the district court was entitled to give some weight to the absence of notice of fees to be charged. Hutton was in a fiduciary relationship to the Plan and, by reason of its unaccepted proposal to Loeb that he pay a 5 percent sales commission followed by what could be considered an investment agreement in substitution, might well have been expected to give notice to all, including plaintiffs in this litigation, of hitherto unmentioned obligations that would burden the Plan assets seven times the fees agreed upon by Loeb and Hutton.[2]

---

2. The legal and brokerage fees total $81,433.95. The market value of the assets sold being $1,505,000, the fee schedule would result in the following computation:

1. % of $500,000 = $ 5,000
.8% of $500,000 = 4,000
.6% of $505,000 = 3,030
Fee, on annual basis: $12,030

Two other considerations also bear on this case, supporting the district court's findings and conclusion. One is the fact that Loeb, according to his counsel, after receipt of Hutton's letter proposing that he pay a 5 percent commission on sales of the stock, informed Hutton that this was not a correct understanding of the consent decree. He did nothing, however, to clarify the situation with those who would be most directly and adversely affected by his interpretation. The district court appropriately cited *Marshall v. Kelly*, 465 F.Supp. 341 (W.D. Okl.1978), in which the court said in words pertinent to the factual situation we face here:

"To the extent there is any uncertainty as to the Plan's liability for additional payment to the Company, the defendant plan trustee was responsible for creating the uncertainty; he was in a position to create contemporaneous documentation of any Plan liability and it was he who created the situation in which it is difficult to determine whether additional payments for construction costs were ever owing from the Plan to the Company." *Marshall v. Kelly, supra*, 465 F.Supp. at 354.

*See also* 29 U.S.C. § 1104(a)(1) (fiduciaries of plans subject to Employee Retirement Income Security Act of 1974 (ERISA) are subject to duty to act "solely in the interest of the participants and beneficiaries" of the plan.)

A second underlying factor distinguishing this case from the average securities transaction is the context giving rise to the consent decree and the prevailing purpose of the court's intervention in structuring the relief ordered. The essential fact is that the decree sought, without any finding of culpability, to remove the cause of plaintiffs' criticisms against defendants' management and valuation of Plan assets. The basic remedy was a sale of the Union Leader stock at fair value by an independent manager. Had there been no accusations, controversy, or litigation, there would have been no reason to sell the stock and, obviously, no obligation to pay legal or brokerage fees on a sale. If the Plan's assets were to be diminished by the expenses incurred in following the court's remedial order, in an amount many times the cost incurred by the corporation under its investment agreement with Hutton, the result would be anomalous: the court would have given with one hand and partially taken away with another.

We therefore affirm the decision of the district court that the legal and brokerage fees attributable to the sale of the Union Leader stock are not to be charged to or paid from the proceeds of that sale. Recognizing that there remain the tasks of determining interest and calculating a precise figure, we remand this case to the district court for such further proceedings as are consistent with this opinion.

*So ordered.*