**M & R INVESTMENT COMPANY, INC., Plaintiff,**

**v.**

**Frank C. FITZSIMMONS, Roy L. Williams, William Presser, Robert Holmes, Donald Peters, J. W. Morgan, Frank H. Ranney, Walter W. Teague, A. D. Matheson, Thomas J. Duffey, John Spickerman, Herman A. Lueking, Jr., J. A. Sheetz, William J. Kennedy, A. G. Massa, and Bernard A. Goldfarb, Trustees of the Central States, Southeast and Southwest Areas Pension Fund, Defendants, Former Trustees,**

**Loran W. Robbins, Robert E. Schlieve, Earl L. Jennings, Jr., Marion M. Winstead, Harold J. Yates, Robert J. Baker, Howard McDougall, Thomas F. O'Malley and R. V. Pulliam, Defendants, Present Trustees,**

**Ray Marshall, Intervenor Defendant.**

**Civ. No. LV 76–114 RDF.**

United States District Court, D. Nevada.

Jan. 14, 1980.

As Amended March 11, 1980.

Morton R. Galane, Melvin D. Close, Jr., of Jones, Jones, Bell, Close & Brown, Las Vegas, Nev., for witness, Lud J. Corrao of Corrao Const. Co., Andrew F. Puzder, St. Louis, Mo., Vargas, Bartlett & Dixon, Christopher L. Kaempfer, for plaintiff Morris Shenker.

Charles H. Miles, Jr., of Dickerson, Miles & Pico, Las Vegas, Nev., Alan M. Mund, Morton G. Rosen, George C. Rudolph, Fulop, Rolston, Burns & McKittrick, Beverly Hills, Cal., for defendants, former trustees.

Leslie Scherr, Thomas A. Wadden, Jr., William F. Krebs of Margolius, Davis & Finklstein, Washington, D. C., Stephen R. Harris, Reno, Nev., Ronald J. Guild, Teitelbaum, Wolfberg, Guild & Toback, Chicago, Ill., for defendants, present trustees.

U. S. Atty. B. Mahlon Brown by William C. Turner, Asst. U. S. Atty., Las Vegas, Nev., Richard P. Carr, David A. Reed, Norman P. Goldberg, Dept. of Labor, Washington, D. C., for intervenor defendant.

## ORDER GRANTING MOTIONS FOR INVOLUNTARY DISMISSAL

ROGER D. FOLEY, Chief Judge.

### PRELIMINARY STATEMENT

Plaintiff makes two claims for relief against the defendants, former Trustees of the Central States, Southeast and Southwest Areas Pension Fund:

First, in Count I, an equitable claim, seeking as a remedy specific performance of an allegedly breached loan contract made between plaintiff and the Pension Fund to loan plaintiff $40 million to erect a 1,000-room addition and other improvements to the Dunes Hotel in Las Vegas, Nevada;

Second, in Count II, an alternative legal claim, seeking as a remedy $100 million in damages for the allegedly breached loan contract.

Plaintiff made a demand "for trial by jury on the issue of damages in the above-entitled action."

The defendants, former Trustees, made a motion that the trial of the issue of liability precede the trial of any other issue in the case. Plaintiff opposed the motion but, in doing so, did not assert that the proposed bifurcation and earlier trial of the issue of liability before any other issue would deprive plaintiff of its Seventh Amendment right to a jury trial. This Court agreed with defendants', former Trustees, conclusions that if the plaintiff did not prevail on the issue of liability, there would not remain any issue relative to damages left to try and therefore granted the motion but provided in the order granting the motion for bifurcation that if plaintiff prevailed on the issue of liability, further time would be allowed for discovery before a jury trial for damages would be conducted.

The trial on the issue of liability began on November 6, 1979, and has continued

through December 5, 1979, when plaintiff rested its case in chief.

After the plaintiff completed the presentation of its evidence and rested its case in chief, the defendants, former Trustees, the defendants, present Trustees, and the intervenor defendant each moved, under Rule 41(b), FRCP, for an involuntary dismissal upon the grounds that upon the facts and the law, the plaintiff has shown no right to relief.

For the purpose of ruling on these motions to dismiss, this Court has disregarded all portions of deposition testimony that were read into evidence upon the demand of defendants' counsel pursuant to Rule 32(a)(4), FRCP. Further, the Court has disregarded all exhibits offered by defendants except those that were received by stipulation of all parties. The Court was not asked to allow defendants to present any witnesses for the defense out of order. The Court did not, over objection of plaintiff's counsel, allow any evidence upon which this Court now relies to come in by way of cross examination by defendants' counsel of witnesses called by plaintiff, which cross examination was beyond the scope of direct examination.

The Court, having considered the law and the evidence before it, exclusive of the above-disregarded evidence, has decided that the motions must be granted and that judgment on the merits should be entered in favor of defendants and against the plaintiff on the issue of liability.

The Court now makes its findings of fact and states its conclusions of law as follows:

## FINDINGS OF FACT

1. M & R, a Nevada corporation, which has its principal place of business in Las Vegas, Nevada, owns and operates the Dunes Hotel and Country Club located in Las Vegas. M & R is a wholly-owned subsidiary of M & R Corporation, a Delaware corporation, which in turn is a wholly-owned subsidiary of Continental Connector Corporation (hereinafter referred to as "Continental"), a New York corporation.

2. Continental owned all of the issued and outstanding shares of stock in Western Transportation Company, a Delaware corporation, between 1968 and February 16, 1976. Western was an employer whose employees were covered by the Pension Fund and Western made contributions to the Pension Fund on behalf of its employees continuously between December 1972 and February 16, 1976.

3. The original defendants are the former Trustees of the Central States, Southeast and Southwest Areas Pension Fund, being Frank E. Fitzsimmons, Roy L. Williams, William Presser, Robert Holmes, Donald Peters, J. W. Morgan, Frank H. Ranney, Walter W. Teague, A. D. Matheson, Thomas J. Duffey, John Spickerman, Herman A. Lueking, Jr., J. A. Sheetz, William J. Kennedy, A. G. Massa, and Bernard A. Goldfarb. By court order of March 7, 1979, the present Trustees of the Pension Fund were joined as defendants in this action, being Loran W. Robbins, Robert E. Schlieve, Earl L. Jennings, Jr., Marion M. Winstead, Harold J. Yates, Robert J. Baker, Howard McDougall, Thomas F. O'Malley, and R. V. Pulliam. All the former and present Trustees are citizens of states other than the State of Nevada.

4. The former and present Trustees have not been sued and have not appeared in this action in their personal or individual capacities. They have been sued and have appeared only in their representative capacities as Trustees of the Pension Fund.

5. The Secretary of Labor intervened in the case as a party defendant on December 1, 1976.

6. The matter in controversy exceeds, exclusive of interest and costs, the sum of $10,000.

7. The Pension Fund is a trust formed pursuant to an Agreement and Declaration of Trust, dated March 16, 1955, as amended (Exhibits 202, 201, 200 and 203), having its principal place of business in the State of Illinois. It was established and is maintained by employers engaged in commerce and is an employee organization representing employees engaged in commerce. As of December 1977, the Pension Fund repre-

sented approximately 500,000 participants and beneficiaries.

8. The Pension Fund's assets are held in trust.

9. The Pension Fund is an employee benefit plan which provides retirement income to employees.

10. At all relevant times, the Revised and Amended Trust Agreement of the Pension Fund (Exhibit 203) provided:

(a) "The Trustees shall have authority to control and manage the operation and administration of the Trust in accordance with applicable law." (Article IV, § 1, page 11.)

(b) "No Trustee shall be liable or responsible for any acts or defaults of any co-Trustee, any other fiduciary, any party in interest or any other person except in accordance with applicable law." (Article II, § 8, pages 7 and 8.)

(c) "The Trustees, to the extent permitted by applicable law, shall incur no liability in acting upon any instrument, application, notice, request, signed letter, telegram, or other paper or document believed by them to be genuine and to contain a true statement of facts, and to be signed by the proper person." (Article IV, § 7, page 13.)

(d) "Any Successor Trustee appointed in accordance with the provisions of this Agreement, upon accepting in writing the terms of this Trust, in a form satisfactory to the Trustees, shall be vested with all of the rights, powers and duties of his predecessor." (Article IV, § 10, page 14.)

(e) " . . . Only the Trustees shall have the authority to approve, modify the terms of, or terminate any loan . . " (Article IV, § 11(a), page 14.)

11. Prior to the death of Irvin J. Kahn on September 10, 1973, the Pension Fund had loaned in excess of $150 million to California-based companies, including the Penasquitos Corporation and Penasquitos, Inc., in which Kahn had a substantial ownership interest. The repayment of these loans had been personally guaranteed by Kahn. Morris A. Shenker also had an ownership interest in certain of these Kahn companies.

12. Following Kahn's death, it appeared that these obligations to the Pension Fund could not be satisfied and it was feared that the Kahn Estate might be thrown into bankruptcy proceedings. A committee of several Trustees of the Pension Fund, called the Penasquitos Committee, determined that the Pension Fund's best interests would be served if a settlement with the Estate of Kahn, to be approved by the California probate court, could be achieved. The Estate of Kahn conditioned settlement on the discharge of Kahn's personal guarantees to the Fund. The Penasquitos Committee determined that, to effect such a settlement, it was necessary to obtain the cooperation of Shenker.

13. The Penasquitos Committee negotiated in an attempt to salvage as much as possible from the loans to these Kahn companies, the financial condition of which was deteriorating. In late February 1974, an overall settlement was reached among the Pension Fund, the Estate of Kahn, with probate court approval, and Shenker, effectuating the discharge of Kahn's personal guarantees, the assumption of substantial personal obligations by Shenker, and the Pension Fund's acquisition of Kahn's largest asset. (Exhibits 14, 15 and 16.)

14. Shenker had owned 50% and Kahn had owned 50% of IJK Nevada, Inc., a Nevada corporation. IJK became wholly owned by Shenker pursuant to the settlement among the Pension Fund, the Estate of Kahn, and Shenker. IJK owned approximately 34% of the issued and outstanding stock of Continental, the major asset of which was the Dunes Hotel and Country Club. As a part of the overall settlement, the Pension Fund participated to the extent of 90% in a $15 million loan in late February 1974 to IJK, which loan was personally guaranteed by Shenker. (Exhibit 13.) The Penasquitos Committee was aware at the time of the Pension Fund's participation in the $15 million loan that IJK would not be able to service the loan indebtedness out of the dividends it would derive from its Continental stock, and that the Continental stock, pledged as collateral for the loan, was so low in value that the loan was under-collateralized.

15. During the said settlement negotiations, there were discussions between the Penasquitos Committee and Shenker relative to the Pension Fund loaning an additional $17,103,372 to IJK to enable IJK to make a tender offer to purchase all outstanding common stock of Continental not then owned by IJK. Such acquisition would nearly triple IJK's earnings from Continental stock (IJK's ownership of Continental stock increasing from approximately 34% to nearly 100%) and thus comparably increasing IJK's ability to retire the $15 million loan and comparably augmenting the collateral.

16. Also during the settlement negotiations, there were discussions between the Penasquitos Committee and Shenker about a proposed loan from the Pension Fund in the amount of $40 million for a proposed 1,000-room high rise to the Dunes Hotel to make it more profitable by becoming more competitive with the newer and larger Las Vegas resort hotels such as the MGM Grand and Hilton.

17. On October 4, 1974, the Trustees of the Pension Fund issued a commitment letter to lend $17,103,372 to IJK in connection with a proposed tender offer by IJK to purchase all the outstanding common stock of Continental not owned by IJK (Exhibit 20).

18. On December 10, 1974, Shenker, acting only as legal counsel for plaintiff, traveled to Chicago to meet with representatives of the Pension Fund. During the course of that day and of the following two days, December 11 and 12, 1974, Shenker met with various representatives of the Pension Fund and discussed with such representatives the Pension Fund's receptiveness to and requirements for a loan to plaintiff in the amount of $40 million for the expansion, remodeling and renovation of the Dunes.

19. Following these meetings on December 10, 11 and 12, 1974, Shenker prepared a formal, written application for such loan to the Trustees of the Pension Fund and delivered it to them in Chicago. This application, which is in the form of a letter, dated December 12, 1974 (Exhibit 28), directed to the Trustees of the Pension Fund and signed by Shenker as general counsel for plaintiff ("plaintiff's loan application"), recites as follows:

"M & R Investment Company, owners of the Dunes Hotel, Las Vegas, Nevada, is contemplating building a 1,000 room addition to its present facilities, to reconstruct and remodel its main showroom, to enlarge its casino and to build additional eating facilities.

"It is contemplated that the cost to build the improvements and to improve the facilities will be in excess of $40,000,000. We are therefore applying for a $40,000,000 loan to be used for construction of new facilities and improving existing facilities, this loan to be paid out by you not before June, 1975, to bear interest at the rate of 9% per annum, to be amortized over a period of 25 years with a balloon note at the end of the 10th year. Of course, the plans and specifications will be subject to your approval.

"As security for this loan, you will receive a mortgage on the new facilities to be erected with the proceeds of your loan, including the golf course, and a mortgage on all the existing facilities, which upon consolidation of the new loan and existing mortgage loans from you, will constitute a first mortgage on all such property.

"This $40,000,000 commitment from you shall be in lieu of the $17,103,372 which you have heretofore issued to I.J.K. Nevada, of which the undersigned is President and sole stockholder. However, to the extent that any portion of the $17,103,372 commitment is disbursed, there will be a corresponding reduction in the $40,000,000 commitment, provided that cost of construction is not less than such reduced amount.

Yours very truly,

M & R INVESTMENT COMPANY

By Morris A. Shenker (signed)

General Counsel"

20. Prior to December 12, 1974, plaintiff had not submitted to the Trustees any written application for a loan by the Pension

Fund to plaintiff in the principal sum of $40 million spelling out the material terms of such loan.

21. Although Shenker had oral discussions with the Penasquitos Committee of the Pension Fund prior to December 12, 1974, concerning the future possibility of a loan from the Pension Fund to plaintiff, those discussions did not eventuate in an oral agreement as to the amount of any loan, its duration, its interest rate, the security, or the rights and remedies of the parties in the event of default.

22. Shenker delivered plaintiff's loan application to the Trustees in Chicago just prior to the meeting of the full board of Trustees on December 12, 1974. The minutes of the meeting of the full board of Trustees, held on December 12, 1974 (Exhibit 30), recite in pertinent part:

"ITEM NO. 1

"DUNES HOTEL

Las Vegas, Nevada

"M & R Investment Company, owner of the Dunes Hotel, by its letter dated December 12, 1974, a copy of which is attached hereto and made a part hereof, has requested a loan in the amount of $40,000,000, to be used for the construction of 1,000 additional rooms to the present Dunes Hotel structure and improvements to the existing structure. It is to bear interest at the rate of 9% per annum, be amortized over 25 years with a balloon payment at the end of the 20th year, and secured by a mortgage not only on the property subject to the existing mortgage to the Pension Fund but also on the golf course property. The requested loan is not required to be disbursed by the Pension Fund prior to June, 1976.

"M & R Investment Company indicated in its letter of December 12, 1974, that if the commitment is issued for the $40,000,000 loan, it shall be in lieu of the outstanding $17,103,372 commitment, dated October 4, 1974, issued by the Pension Fund to I. J. K. of Nevada, Inc.

"Furthermore, upon full disbursement of the $40,000,000 loan and the completion of the construction, the new mortgage and prior mortgages shall be consolidated, providing for the same interest rate and amortization as indicated above.

"This request was deferred to the next meeting of the Committee.

"Informational."

23. The next action taken by the Pension Fund in connection with plaintiff's loan application was the transmittal to plaintiff of the Pension Fund's letter of January 13, 1975, containing the Trustees' commitment letter for the $40 million loan (Exhibit 32). This commitment letter was immediately followed and withdrawn by the Pension Fund's telegram of January 14, 1975 (Exhibit 31), which recited:

"REVIEW OF OUR RECORDS DISCLOSES ABSENCE OF PROPER APPROVAL OF LOAN OF $40 MILLION BY THE FULL BOARD OF TRUSTEES. THEREFORE COMMITMENT DATED JANUARY 13, 1975 IS OF NO FORCE AND EFFECT. KINDLY RETURN ALL COPIES OF EXECUTED COMMITMENT FOR REISSUE WHEN AND IF THERE IS SUCH APPROVAL BY THE FULL BOARD OF TRUSTEES."

24. On or about January 15, 1975, plaintiff returned the January 13, 1975, commitment letter for cancellation. Prior to plaintiff's receipt of the Pension Fund's telegram of January 14, 1975, plaintiff had made no attempt to accept, and had not accepted, the terms of the Pension Fund's January 13, 1975, loan commitment.

25. The minutes of the full board of Trustees of January 17, 1975 (Exhibit 33) read in pertinent part:

"ITEM NO. 2.

"DUNES HOTEL (M & R INVESTMENT COMPANY)

Las Vegas, Nevada

"A question arose as to whether the Full Board of Trustees approved the request of M & R Investment Company for a loan in the amount of $40,000,000 at its meeting held December 12, 1974.

"The consensus of the Trustees was that action had been taken approving the request and that the minutes of the December 12, 1974, meeting should be amended to so reflect this action. A mo-

tion was then made, seconded and carried that the minutes of the December 12, 1974 meeting (Miscellaneous Item No. 1) are therefore amended to reflect this action as set forth below.

'After a full discussion a motion was made, seconded and carried to approve a $40,000,000 loan to M & R Investment Company, provided we receive a written agreement from I. J. K. of Nevada, Inc. that said $40,000,000 commitment would be issued in lieu of the $17,103,372 commitment heretofore issued to I. J. K. of Nevada, Inc.; and provided, further, that all licensing requirements of the city, county and state are satisfied; the funds are to be used for the construction of 1,000 additional rooms to the present Dunes Hotel structure and improvements to the existing structure; said loan to bear interest at the rate of 9% per annum and amortized over 25 years with a balloon payment at the end of the 20th year; no part of the loan proceeds are to be disbursed by the Pension Fund prior to June, 1976; that upon completion of construction, the new mortgage and the existing mortgage shall be consolidated providing for the same interest rate and amortization as indicated above; and that such new loan shall be guaranteed by (1) Morris Shenker, sole stockholder of I. J. K. of Nevada, Inc., which owns in excess of 38% of the issued and outstanding shares of Continental Connectors Corporation, the parent corporation of the borrower, and (2) Continental Connectors Corporation.' "

26. The Trustees' minutes of January 17, 1975, contained several additions to and modifications of the proposed terms set forth in plaintiff's loan application.

27. Following the approval by the full board of Trustees of the $40 million loan to plaintiff, the Pension Fund transmitted to plaintiff its January 24, 1975, Commitment Letter. The Commitment Letter embodied the Pension Fund's commitment, upon acceptance thereof by plaintiff, for a loan to plaintiff in the amount of $40 million, which, according to its terms, was to be used for the sole purpose of financing the construction, furniture, furnishings and equipment contemplated in connection with the 1,000-room addition to the Dunes and the reconstruction and remodeling of the main showroom, enlargement of the casino and construction of additional eating facilities.

28. Unlike plaintiff's letter of December 12, 1974, the Commitment Letter expressly delineates all of the terms upon which the Pension Fund's $40 million loan would be based.

29. On March 3, 1975, Continental's Board of Directors, at a special meeting held on said date, resolved to accept the loan commitment as set forth in the Commitment Letter, and authorized Continental's officers " . . . to take whatever further action and to sign whatever documents may be necessary . . . " to accept the loan commitment.

30. Also, on March 3, 1975, Shenker became a Director of Continental.

31. On March 4, 1975, a special combined meeting of the Board of Directors and sole stockholder of plaintiff was held, at which meeting plaintiff resolved to accept the loan commitment as set forth in the Commitment Letter, and authorized the officers of and counsel for plaintiff to execute all documents necessary to perfect such acceptance.

32. At such special combined meeting of the Board of Directors and sole stockholder of plaintiff on March 4, 1975, Shenker was elected an officer and director of plaintiff.

33. Pursuant to the authority conferred upon him by the resolution of plaintiff's Board of Directors and sole stockholder on March 4, 1975, Major A. Riddle, plaintiff's president, examined the terms and conditions of the Commitment Letter, approved them and executed an acceptance of the Commitment Letter on behalf of plaintiff on March 7, 1975.

34. The Commitment Letter was received by mail or personally delivered to the Pension Fund in Chicago on March 10, 1975, as an enclosure to a letter signed by Shenker, then Chairman of plaintiff's Board of Directors.

35. Further, in accordance with the resolution of plaintiff's Board of Directors on March 4, 1975, and the provisions of Paragraph 15 of the Commitment Letter, plaintiff paid to the Pension Fund in Chicago the service fee of $440,000 required by the Commitment Letter, also on March 10, 1975.

Plaintiff's contention that the loan commitment became a binding contract before January 1, 1975, is not supported by the evidence in this case. The undisputed evidence shows: that the M & R loan application for $40 million was made on December 12, 1974; that the loan commitment was authorized on January 17, 1975; was executed by the Pension Fund on January 24, 1975; and that the loan commitment and its terms were accepted by M & R on March 10, 1975, on which date there first existed a binding loan contract.

36. Prior to March 10, 1975, there was no "binding agreement," either oral or in writing, between the Pension Fund, or anyone acting on its behalf, on the one hand, and plaintiff, or anyone acting on its behalf, on the other hand, pursuant to which the Pension Fund would loan to plaintiff the sum of $40 million, or any other sum, for the expansion, remodeling and renovation of the Dunes Hotel and Country Club.

37. From and after January 24, 1975, plaintiff and its authorized representatives consistently stated and represented to its shareholders, to various governmental authorities in the State of Nevada, and to the United States Securities and Exchange Commission that the $40 million loan commitment was obtained by plaintiff from the Pension Fund in January 1975.

38. On November 12, 1975, plaintiff advised the Pension Fund that the loan contemplated by the Commitment Letter might constitute a prohibited transaction under the provisions of the Employee Retirement Income Security Act of 1974 (ERISA) because plaintiff's parent, Continental, also owned Western Transportation, which had employees covered by the Pension Fund and which annually contributed substantial sums to the Pension Fund on behalf of such employees.

39. The minutes of the November 14, 1975, meeting of the Executive Committee of the Pension Fund (Exhibit 57) reflect the following:

"A discussion ensued wherein it was noted that, regardless of the legality of the loan commitment to M & R Investment Company at its inception, any disbursement and subsequent consummation of the loan transaction would constitute a violation of the 'prohibited transaction' provisions of ERISA. Also, any lending of money or extension of credit, derived from the Pension Fund's commitment, would constitute a violation.

"Any violation based on the party-in-interest relationship between the Pension Fund and Western Transportation Company would be avoidable, however, upon divestiture of all interest in Western by its 100% parent corporation, Continental Connector Corporation. (underscoring added)

"One possible course of action suggested to avoid the expense and uncertainty of potential litigation (by M & R Investment Company, which might charge the Fund with breach of contract for extricating itself on the basis of a pure and unavailable technicality) is that the Trustees reconsider the application of M & R Investment Company as a new loan application.[1] A resolution might be considered that, because of prior history, and upon a review of the merits, the Trustees shall accept and reconsider the prior application as a new loan application with a new commitment letter if the loan is granted. The fact that the Borrower brought the situation to the attention of the Pension Fund was also discussed as a significant consideration."

40. In a letter dated November 14, 1975 (Exhibit 50), prepared by Attorney Nellis and signed by Daniel J. Shannon, Executive Director of the Pension Fund, to M & R, it was stated as follows:

"By reason of information received from you on November 12, 1975, it has

---

1. Apparently after divestiture by Continental of Western.

been learned by the Pension Fund and Trustees thereof, for the first time, that the loan commitment to M & R Investment Company, dated January 24, 1975, would apparently create a prohibited transaction within both Title I and Title II of the 'Employee Retirement Income Security Act of 1974.'

"The impediment arises from the fact that both M & R Investment Company and Western Transportation Company which is (a *contributing employer* to the Pension) are wholly-owned subsidiaries of Continental Connector Corporation, and thus each of the three corporations is both a ' "party-in-interest" ' within Title I and a ' "disqualified person" ' within Title II. A loan to any such entity would be unlawful. (emphasis supplied)

"Unless the impediment arising from the relationship of the three companies is removed, there can be no disbursement upon the loan commitment. We accordingly ask that within two weeks you inform us of your intentions in writing and that, until this matter has been resolved, no steps be taken to secure credit on the basis of our commitment."

41. In a letter dated December 2, 1975 (Exhibit 52), M & R responded to the November 14, 1975, letter from the Pension Fund, stating as follows:

"M & R Investment Company does intend to exercise the loan commitment, and, of course, prior to requesting disbursement upon the loan commitment and prior to securing credit on the basis of your commitment, any impediments will be removed, hopefully within this month."

42. At the December 18, 1975, meeting of the full board of Trustees, the minutes of the November 14, 1975, meeting of the Executive Committee were considered.

43. At the December 18, 1975, meeting of the full board of Trustees (Exhibit 56), the following action was taken:

"After a full discussion a motion was made, seconded and unanimously carried to adopt the recommendation of the Executive Committee to inform M & R Investment Company that, in view of the

fact that it brought this situation to the Fund's attention, it appears that any loan disbursement at the present would be a 'prohibited transaction' not permitted (absent an exemption) by ERISA and that, unless that impediment is removed, the Fund will be unable to disburse; and that the Borrower also be informed that the Fund requests M & R Investment Company to advise of its intentions within two weeks, that the Fund can plan its cash flow needs; and further requests that no credit is to be extended on the commitment in any way until the matter has been resolved."

44. Morton J. Harris ("Harris"), an attorney for the Pension Fund, on February 5, 1976, requested the Commissioner of Internal Revenue to rule on whether the proposed $40 million loan was a prohibited transaction under the provisions of the ERISA sections of the Internal Revenue Code.

45. Harris' request for ruling was set forth in a letter (Exhibit 64) which Harris delivered on February 5, 1976, to Mary Jo Fite, an IRS agent and tax law specialist. That letter set forth the Continental–M&R–Western Transportation family structure and requested a ruling:

". . . that from and after the date CONTINENTAL sells the shares of stock of (Western) TRANSPORTATION to WESTRAN in accordance with the transaction as hereinabove described:

(1) M&R will not be a 'disqualified person' under Code Section 4975(e)(2) with respect to the PENSION FUND, and

(2) The disbursement of the subject loan will not constitute a prohibited transaction under Code Section 4975(c)(B)."

46. Concurrently with delivering the request for ruling to the IRS, Harris additionally requested the Department of Labor to coordinate the processing of the ruling request with the IRS.

47. Attorney Harris and Mary Jo Fite discussed the possibility of the Pension Fund of seeking an administrative exemption. They discussed what documents the

IRS and DOL would likely want supplied prior to deciding whether or not to grant such an exemption. Fite also explained that the IRS and DOL would investigate the history of the trust fund's prior loans to determine whether they had been adequately secured, and whether there had been defaults and what percentage of the Fund's assets had been invested in like loans, etc. Upon learning these things, Harris recommended that the Pension Fund not pursue an administrative exemption.

48. Shenker sent a telegram on February 12, 1976, to Shannon, the Executive Director of the Pension Fund, which stated:

"RE M AND R COMMITMENT FOR 40 MILLION DOLLARS I UNDERSTAND THAT THERE HAS BEEN MISUNDERSTANDING REGARDING DISBURSEMENT ON THAT COMMITMENT PLEASE BE ADVISED THAT WE WILL MAKE NO REQUEST FOR DISBURSEMENT UNDER THIS LOAN UNTIL THE ERISA QUESTION CONCERNING PROHIBITED TRANSACTION HAS BEEN RESOLVED."

49. After fully considering the problem created by Continental's ownership of Western Transportation, Continental's directors, officers and attorneys determined that it would be in Continental's best interests to divest itself of ownership of Western Transportation, rather than seek an administrative exemption for the $40 million loan transaction.

50. On February 16, 1976, Continental entered into a written sales agreement under which it sold all of the stock of Western Transportation to WESTRAN CORPORATION ("Westran"), a corporation organized and incorporated on or about January 30, 1976, in the State of Illinois.

51. At all times on and after January 30, 1976, to and including the present, William E. Schindler ("Schindler") has been and is the sole stockholder of Westran. Until February 16, 1976, Schindler was the president of Western Transportation and a director of Continental.

52. Under the terms of the sale agreement, Westran was and is obligated to pay to Continental a purchase price of $6 million in specific installment payments. The terms of the sale agreement further provide that until the purchase price is paid, Valley Bank of Nevada is to hold all Western Transportation stock in escrow, along with a blank assignment of said stock executed by Schindler in his capacity of president of Westran for the benefit and on account of Continental. The Western Transportation stock thus became and was and is the sole security for Westran's performance under the sale agreement.

53. The Executive Committee and the full board of Trustees at their meeting of February 23, 1976 (Exhibit 87), discussed the following reports by their representatives Morton J. Harris and William J. Nellis:

"Attorney Morton J. Harris reported M & R Investment Company is currently negotiating the sale of Western Transportation thereby removing the existing impediment. The IRS has not yet promulgated either temporary or permanent regulations on the type of transactions which would be prohibited concerning this type of commitment, therefore, it cannot be determined whether the sale of Western Transportation will remove the existing impediment until a ruling comes down stating that M & R is a qualified person for a loan under ERISA. It is anticipated that it may take six months for such a ruling.

"Attorney Harris further reported loans granted prior to ERISA which were not prohibited at that time and which are now classified as prohibited will have a ten year period in which to be paid off, provided the loan remains at least favorable under certain criteria, but even IRS cannot agree on the criteria.

"Attorney William J. Nellis reported relative to the Joint-Labor Justice Department's Central States Task Force investigation of this loan transaction, the potential prospect of civil injunctive litigation, the potential grounds for challenge and the alternatives."

54. On May 17, 1976, Harris telephoned Fite at the IRS. During the telephone conversation that followed, Fite told Harris that the IRS had reviewed Harris' request for ruling and that the IRS intended to issue an adverse ruling. Fite also told Harris that the IRS believed the disbursement of the $40 million loan from the Pension Fund to plaintiff would constitute a prohibited transaction under Internal Revenue Code, Section 4975, and that the fact that Western Transportation had been sold had no effect upon the prohibited nature of the transaction, since the prohibition was extant at the time plaintiff accepted the terms of the Commitment Letter.

55. On June 3, 1976, Harris met with representatives of the IRS and the DOL. He was again told that a ruling would be forthcoming which would set forth the Government's view that the $40 million loan transaction was prohibited under the provisions of ERISA.

56. Before the Government had advised Harris of its conclusion that the $40 million loan transaction was prohibited, plaintiff had some knowledge of the IRS and DOL's respective investigations into the propriety of the loan commitment.

57. The Pension Fund Trustees at a meeting on June 7–8, 1976, voted to rescind the M & R loan commitment and to return the $440,000 service fee to M & R. Plaintiff learned of this action shortly after it was taken. This action was confirmed by letter of June 23, 1976, to M & R from the Executive Director of the Pension Fund. The letter (Exhibit 131) indicated:

"After a Request for Ruling had been submitted on behalf of the Pension Fund to both the Internal Revenue Service and the U.S. Department of Labor, and at a subsequent conference in Washington, D.C. with representatives of each of said agencies, it was indicated to our attorney that said commitment letter and the receipt by the Pension Fund of your commitment fee constituted a prohibited transaction as defined in said Act, and that the subsequent sale of Western Transportation Company, even if it were determined to be a bona fide sale and divestiture, did not correct the prior prohibited transaction.

"In view thereof, the Trustees of the Pension Fund, by appropriate action, have authorized me to refund to you the commitment fee of $440,000.00, a check in which amount is enclosed, and to advise you that the Pension Fund regards the commitment as rescinded and will not disburse any loan proceeds contemplated by the commitment letter."

58. Plaintiff received this letter of rescission and the refunded service fee on June 29, 1976, in Nevada. Prior to receiving the Pension Fund's letter of rescission, plaintiff filed this lawsuit on the morning of June 24, 1976, seeking specific performance of the loan commitment of $40,000,000 and $100,000,000 in damages.

59. After the rescission of the loan commitment became known to the IRS and DOL, the forthcoming adverse ruling was not handed down because, in their view, the issue had become moot.

60. Neither plaintiff nor the Pension Fund representatives ever sought, and there never has been granted, an administrative exemption from ERISA's prohibited transaction rule for the $40 million loan contract.

61. This Court finds by a preponderance of the evidence that: all the while M & R and the Trustees of the Pension Fund were engaged in negotiations for the $40 million loan; when the loan application was made on December 12, 1974; when the loan commitment was approved January 17, 1975, and issued January 24, 1975; when the loan contract was entered into on March 10, 1975; and for many months thereafter, neither M & R nor the Trustees knew or suspected that the loan contract was a prohibited transaction. They had no idea that they had a problem in this regard. Nor were they aware, although each should have been, of Continental Connector's common ownership of both Western Transportation Company and M & R. When in November of 1975 M & R learned from its auditors that the loan contract may be a

prohibited transaction and M & R so advised the Trustees, both agreed to the divestiture of Western as the remedy to remove the so-called taint. In November 1975, both M & R and the Trustees of the Fund believed that such divestiture would correct the problem. M & R then proceeded with the divestiture of Western Transportation Company and the sale to Westran took place on February 16, 1976.

62. In the months following November 1975, the Trustees and their advisors became uncertain about the status of the loan contract under ERISA and doubtful whether divestiture would correct the problem. The Trustees decided to seek a ruling. The Trustees made written application in February of 1976 to the Commissioner of Internal Revenue for a ruling as to whether the loan contract was a prohibited contract under ERISA, revealing Continental's planned divestiture of Western. Representatives of the Pension Fund also discussed the problem with IRS and DOL employees, including a discussion of the possibility of the Trustees seeking an administrative exemption. When the Fund's representatives learned the extent of the investigation into earlier loan transactions in which the Fund had engaged that would be made by IRS and DOL preliminary to acting on the request for an administrative exemption, the Trustees decided not to seek an administrative exemption but to wait for the ruling that had been requested. Later on after the representatives of the Fund had been advised by the IRS that the ruling would be adverse, that is, that the loan contract constituted a prohibited transaction under ERISA, the Trustees, acting on the counsel of their advisors, elected to rescind the contract in early June of 1976 and so advised M & R by letter of June 23, 1976.

63. While it appears that M & R was not kept fully advised by representatives of the Fund as to the day to day dealings between the Fund and the IRS and DOL relative to the prohibited transaction problem and of the day to day discussions taking place between the Trustees and their advisors in regard to the same, it is clear from the evidence that M & R knew the essentials, that is, M & R knew of the request for a ruling and later learned that if rendered it would be adverse and, further, M & R knew of the decision of the Pension Fund not to seek an administrative exemption.

64. Plaintiff's argument that the evidence does not show that the Pension Fund knew or should have known that M & R was a party in interest, is without merit. The Pension Fund had extensive dealings with the Dunes Hotel and its principals over the years. The Pension Fund had loaned money to Jake Gottlieb for the Dunes, while at the same time Jake Gottlieb was a record owner of Western Transportation Company. Therefore, this Court finds that the Pension Fund Trustees knew or should have known that Continental Connector, the parent corporation of M & R, was also the parent corporation of Western Transportation Company.

65. At this point in the trial, this Court makes no findings of fact that any of the various affirmative defenses set forth by the defendants have either been proved or not proved.

## CONCLUSIONS OF LAW

1. Jurisdiction is based upon both diversity of citizenship and the existence of a substantial federal question. Plaintiff's claim is in excess of $10,000, exclusive of interest and costs.

2. Diversity jurisdiction exists pursuant to the provisions of Title 28 U.S.C. § 1332.

3. This Court has jurisdiction under Title 28 U.S.C. § 1331(a), in that the matter in controversy arises under the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), Title 29 U.S.C. § 1001 et seq.

4. The Central States, Southeast and Southwest Areas Pension Fund ("Pension Fund") is an employee pension benefit plan within the meaning of § 3(2) ("ERISA"), Title 29 U.S.C. § 1002(2). The Pension Fund is subject to the coverage of ERISA pursuant to ERISA § 4(a), Title 29 U.S.C. § 1003(a), and has been subject to ERISA

**1054**

since January 1, 1975. ERISA § 414(a), Title 29 U.S.C. § 1114(a). The defendants, present Trustees, as trustees of an employee benefit plan covered by ERISA are fiduciaries with respect to the Pension Fund within the meaning of ERISA, § 3(21)(A), Title 29 U.S.C. § 1002(21)(A).

■ 5. ERISA is a comprehensive remedial statute designed to protect the pensions and other benefits of employees. *Eaves v. Penn,* 587 F.2d 453, 457 (10th Cir. 1978); *Wadsworth v. Whaland,* 562 F.2d 70, 73–74 (1st Cir. 1977), cert. denied, 435 U.S. 980–81, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978); *Marshall v. Snyder,* 430 F.Supp. 1224 (E.D.N.Y. 1977), aff'd, 572 F.2d 894, 901 (2d Cir. 1978). Courts have recognized the broad sweep of its provisions, *Nachman Corp. v. PBGC,* 592 F.2d 947 (7th Cir.), cert. granted, 442 U.S. 940, 99 S.Ct. 2881, 61 L.Ed.2d 310 (1979), and have adopted a liberal construction in order to carry out the statute's purposes of safeguarding the interests of plan participants and beneficiaries and preserving the integrity of plan assets. *Marshall v. Kelly,* 465 F.Supp. 341, 349 (W.D.Okl.1978).

■ 6. The defendants, former Trustees, as trustees of an employee benefit plan covered by ERISA, were fiduciaries with respect to the Pension Fund within the meaning of ERISA § 3(21)(A), Title 29 U.S.C. § 1002(21)(A), until such times as they resigned.

7. On and after the effective date of the relevant sections of ERISA, Western Transportation Company was a "party in interest" with respect to the Pension Fund by virtue of ERISA § 3(14)(C), because it made contributions to the Pension Fund. ERISA § 3(14)(C) provides:

"The term 'party in interest' means, as to an employee benefit plan . . . an employer any of whose employees are covered by such plan." 29 U.S.C. § 1002(14)(C).

8. On and after the effective date of the relevant sections of ERISA, Continental Connector Corporation was a "party in interest" with respect to the Pension Fund by virtue of ERISA § 3(14)(E)(i), because it owned all of the stock of Western Transpor-

tation Company. ERISA § 3(14)(E)(i) provides:

"The term 'party in interest' means, as to an employee benefit plan . . . an owner, direct or indirect, of 50 percent or more of the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation . . . which is an employer [any of whose employees are covered by such plan]." 29 U.S.C. § 1002(14)(E)(i).

9. On and after the effective date of the relevant sections of ERISA, M & R Investment Company, Inc., was a "party in interest" with respect to the Pension Fund by virtue of ERISA § 3(14)(G)(i), because its parent, Continental, owned Western Transportation Company. ERISA § 3(14)(G)(i) provides:

"The term 'party in interest' means, as to an employee benefit plan . . . a corporation . . . of which (or in which) 50 percent or more of . . . the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation . . . is owned directly or indirectly, or held by persons [or entities] described in [ERISA § 3(14)(E)]." 29 U.S.C. § 1002(14)(G)(i).

10. Because the loan contract was entered into after January 1, 1975, the provisions of ERISA prohibiting transactions between a plan and a party in interest must be read to govern the loan contract. See ERISA §§ 406(a), 414(a), Title 29 U.S.C. §§ 1106(a), 1114(a) (effective date of January 1, 1975, for ERISA's prohibited transaction section.)

■ 11. As a loan to a party in interest, the $40 million commitment from the Pension Fund to M & R constitutes a prohibited transaction within the meaning of ERISA § 406(a)(1)(B). That section provides:

"A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . lending of money or other extension of credit between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(B).

The loan also was a prohibited transaction under the similar provisions of the Internal Revenue Code. See Title 26 U.S.C. § 4975(c)(1)(B).

■ 12. The defense offered by plaintiff, that it acted in good faith with regard to the loan and that a mere technical violation was involved, are unavailing. As one court has said, "Congress [in ERISA § 406] intended to create an easily applied per se prohibition (underscoring added) . . . of certain transactions, no matter how fair, unless the statutory exemption procedures [of ERISA § 408(a)] are followed." *Cutaiar v. Marshall*, 590 F.2d 523, 529–30 (3d Cir. 1979); see also *Eaves v. Penn*, 587 F.2d 453, 457–59 (10th Cir. 1978). Lack of harm to the plan or the good faith or lack of the same on the part of the borrower are not relevant, and certainly not controlling, under ERISA § 406. Rather, "Congress was concerned in ERISA [§ 406] to prevent transactions which offered a high potential for loss of plan assets or for insider abuse . . . ." (*Marshall v. Kelly*, 465 F.Supp. 341, 354 (W.D.Okl.1978)). Accordingly, the Court finds unconvincing and without significance testimony introduced during the course of the trial purporting to show that the transaction at issue was in the interests of the Pension Fund or that it may otherwise have been prudent.

13. The defenses relied upon by plaintiff to avoid the conclusion that the loan was a prohibited transaction are similarly unpersuasive. These defenses, which the Court deals with separately below, pertain to the timing of the M & R loan, the knowledge attributable to the Pension Fund Trustees, the ostensible correction of the prohibited transaction, and the availability of various administrative exemptions.

14. As a trust, the Pension Fund can act only by and through its duly appointed and acting Trustees.

■ 15. The former Trustees have never been served with process or appeared in this action in their personal or individual capacities.

16. No basis exists for personal jurisdiction in this court in this action over the former Trustees.

17. The present Trustees are joined as parties defendant to this action in their representative capacity only as Trustees of the Pension Fund.

18. The present Trustees have never been served with process or appeared in this action in their personal or individual capacities.

19. No basis exists for personal jurisdiction in this court in this action over the present Trustees.

20. No legally binding contract was entered into by and between plaintiff and the Pension Fund providing for the loan of $40 million to plaintiff, or any loan, prior to January 1, 1975.

21. Plaintiff's loan application of December 12, 1974 (Exhibit 28), constituted merely a preliminary offer suggesting some terms for the $40 million loan requested by plaintiff.

22. The January 13, 1975, Commitment Letter (Exhibit 32) transmitted by the Pension Fund to plaintiff constituted an offer for a contract in the nature of an option.

23. The offer embodied within the Pension Fund's January 13, 1975, Commitment Letter was revoked by the Pension Fund's telegram of January 14, 1975 (Exhibit 31), prior to plaintiff's acceptance of the terms of such January 13, 1975, Commitment Letter.

24. The Pension Fund's January 24, 1975, Commitment Letter (Exhibit 35), at the time it was transmitted to plaintiff, constituted an offer for a contract in the nature of an option.

25. Plaintiff accepted the offer, embodied in the Commitment Letter on March 10, 1975, by delivering to the Pension Fund in Chicago on that date the Commitment Letter executed by and on behalf of plaintiff, together with the loan service fee of $440,000.

26. A legally binding loan contract was not formed by and between plaintiff and the Pension Fund until March 10, 1975, which contract consisted of all of the terms contained in the Commitment Letter. Said contract is hereinafter referred to as the "loan contract."

27. The loan contract is subject to and governed by the provisions of ERISA.

28. The provisions of ERISA preempt state law. Insofar as ERISA is concerned, federal common law governs the parties' rights, duties and obligations under the loan contract. Insofar as the non-ERISA contract related issues in this case are concerned, the law of Illinois governs. It was the state of negotiations, offer and acceptance, contract formation, and place of contemplated performance.

29. Plaintiff's contention that the loan commitment was effectuated or binding prior to the date when ERISA took effect on January 1, 1975, is not supported by the plain evidence of the case. As this Court has found, undisputed documentary evidence shows that the M & R loan application for $40 million was made in December 1974; that the loan commitment was executed by the Pension Fund in January 1975; and that the loan commitment and terms were accepted by M & R in March 1975, and that M & R and Continental have consistently advised shareholders, state authorities, and the Securities and Exchange Commission that the loan commitment was obtained in January 1975. Accordingly, the Court concludes that the loan contract was entered into at a time when the provisions of ERISA prohibiting party in interest transactions were applicable.

30. Even if the Court were to find that M & R and the Pension Fund entered into a legally binding contract in December 1974, ERISA would still operate to prohibit the loan. As of January 1, 1975, the effective date of the prohibited transaction section of ERISA (see ERISA § 414(a)), a loan executed in December 1974 would have been a prohibited transaction under ERISA § 406. Therefore, even if the loan had been executed on the eve of the effective date of ERISA, as plaintiff suggests, the Court would still be required to hold that the transaction was barred by the provisions of ERISA § 406(a) and § 414(a), as of January 1, 1975.

31. Finally, plaintiff's efforts to fit the loan within the "transition rule" of ERISA (§ 414(c)(1)) are unsupported and uncon-

vincing. That section of ERISA provides that § 406, the prohibited transaction section, does not apply to certain kinds of "binding contract[s]" in effect on July 1, 1974. ERISA § 414(c)(1) provides, in pertinent part:

"Section 406 [29 U.S.C. § 1106] . . . (relating to prohibited transactions) shall not apply . . . until June 30, 1984, to a loan of money or other extension of credit between a plan and a party in interest under a binding contract in effect on July 1, 1974 (underscoring added) (or pursuant to renewals of such a contract), if such loan or other extension of credit remains at least as favorable to the plan as an arm's-length transaction with an unrelated party would be, and if the execution of the contract, the making of the loan, or the extension of credit was not, at the time of such execution, making, or extension, a prohibited transaction (within the meaning of section 503(b) of the Internal Revenue Code of 1954 [Title 26] or the corresponding provisions of prior law)." 29 U.S.C. § 1114(c)(1).

See also 44 Fed.Reg. 24876, 24878 n. 7 (1979) (proposed § 414(c) regulations, incorporating state contract law). The Court has already determined that the loan commitment was formally extended by the Pension Fund in January 1975, and formally accepted by M & R in March 1975. Accordingly, the Court finds that the M & R loan does not fit within the terms of ERISA § 414(c)(1), exempting from § 406 various binding contracts entered into before July 1, 1974.

32. Plaintiff's contention that the Pension Fund Trustees "did not know" or "should not have known" that M & R was a party in interest, an essential element of a § 406 violation, is without merit. The Pension Fund Trustees had had extensive prior dealings with the Dunes Hotel and its principals and should have been aware of Western Transportation Company and M & R's party in interest relationship. (See Finding of Fact No. 64.) Equally important, knowledge is imputed to the Pension Fund Trustees; a "thorough investigation" is mandated in any "significant transaction" to deter-

mine if the borrower is a party in interest. H.R.Rep.No. 1280, 93d Cong., 2d Sess. 307, 1974 U.S.Code Cong. & Admin.News at pp. 4639, 5087; see *Marshall v. Kelly*, 465 F.Supp. 341, 351 (W.D.Okl.1978). Such an investigation would have disclosed Western Transportation Company and M & R's party in interest status, as well as their common parent Continental Connector. Plaintiff therefore cannot rely upon defendants' alleged lack of knowledge of its party in interest relationship to the Pension Fund.

33. While ERISA's prohibited transaction rule in the Labor Code, Title 29 U.S.C. § 1106(a)(1), provides that a fiduciary shall not cause the plan to engage in a prohibited transaction *if the fiduciary knows or should know*, etc., in its Internal Revenue Code counterpart, Title 26 U.S.C. § 4975(c)(1), in defining a prohibited transaction, no similar language relative to knowledge, actual or constructive, is found.

It would seem that the reason for the requirement of knowledge is that knowledge is a prerequisite to the imposition of certain penalties upon a fiduciary under Title 29 U.S.C. §§ 1109 and 1132. It would appear that such knowledge, actual or constructive, on the part of a fiduciary has no bearing at all upon whether or not such a transaction is a prohibited one. It must also be kept in mind that under Title 29 U.S.C. § 1002(14)(A) a fiduciary includes, in addition to a trustee, any administrator, officer, custodian, counsel or employee of the plan. It is noted that Title 26 U.S.C. § 4975(e)(2)(A) does not define "fiduciary."

[8] 34. Plaintiff may not properly claim that the February 1976 divestiture of Western Transportation Company by M & R's parent, Continental Connector Corporation, cured or "corrected" the prohibited transaction. The terms "correction" and "correct" have a specialized meaning in ERISA. They are defined as:

"... <u>undoing the transaction to the extent possible</u>, but in any case placing the plan in a financial position not worse than that in which it would be if the disqualified person [i. e., party in interest] were acting under the highest fiduciary standards." 26 U.S.C. § 4975(f)(5). (underscoring added.)

Assuming arguendo that the divestiture of Western was a bona fide transaction, it falls far short of "undoing" the prohibited transaction, as called for in the statute. Only a cancellation or rescission of the contract would have constituted a true "correction" of the prohibited transaction. This was not undertaken by plaintiff.

35. Likewise, M & R cannot circumvent the clear prohibitions of ERISA and achieve enforcement of the contract by dissecting the loan transaction into independent parts, i. e., claiming that while the loan contract may have constituted a prohibited transaction in 1975, the loan disbursement (scheduled to commence in June 1976) was not a prohibited transaction since, by that time, the party in interest link had been broken through the February 1976 divestiture of Western. Such an approach ignores the realities of the parties' contractual undertaking as well as the plain purposes of ERISA § 406. The Pension Fund's payout of $40 million cannot be isolated or disassociated from its earlier commitment and loan contract to lend money to M & R. A contract like the Pension Fund's loan contract creates legally binding obligations from which a subsequent disbursement of funds draws legal and practical significance; here, in fact, plaintiff is seeking specific performance of a loan contract so as to obtain disbursement of loan proceeds. Moreover, the Court will not construe ERISA to allow a party in interest to obtain a benefit or a loan otherwise prohibited under the Act as long as the party in interest subsequently purges, or agrees to purge, the taint or the prohibited transaction link. Such action is contrary to the intent of ERISA § 406(a)(1)(B), which proscribed transactions "constitut[ing] a direct or indirect . . . lending of money." An interpretation like the one urged by plaintiff could well open up the very abuses that Congress intended through the per se prohibited transaction rules to prevent and eliminate.

■ 36. The time when the instant transaction is to be examined to determine if the same is barred as a prohibited transaction is that moment when the loan commitment of the Fund had been accepted by

the prospective borrower, M & R, according to its terms, and a binding contract made, here on March 10, 1975. At that date and time and not before, the transaction became a prohibited one under Title 29 U.S.C. § 1106(a)(1)(B) and 29 U.S.C. § 4975(c)(1)(B). It is the status and legal relationships of the borrower at that time and date that trigger the application of the statute. The borrower's status and legal relationships at that time are frozen, so to speak. A bona fide divestiture of Western by Continental Connector after the loan contract was entered into on March 10, 1975, would be wholly ineffective to remove the so-called taint. The transaction, from and after the time that the loan contract was made, was and remained a prohibited one. The loan contract remained unenforceable unless and until an administrative exemption be obtained (from the Secretary of Labor under Title 29 U.S.C. § 1108 or from the Secretary of the Treasury under Title 26 U.S.C. § 4975(d)) or, as is the case here, one of the parties rescinded the loan contract. Although the loan contract was unenforceable, it could have been made enforceable had an administrative exemption been granted before rescission.

37. Let us assume that during negotiations for the loan, M & R and the Fund Trustees had become aware that the loan under discussion would be a prohibited transaction and had agreed to a bona fide divestiture of Western before negotiations proceeded any further. Once such a bona fide divestiture was accomplished, the loan contract could have been entered into and it would have been a valid and enforceable contract. The divestiture would have removed the taint. On the other hand, let us assume that M & R and the Trustees of the Fund during negotiations became aware that the proposed loan under discussion would be a prohibited transaction, rather than take the divestiture route suggested above they could have entered into a loan contract with a specific condition spelled out therein that the loan contract would not be performed and, particularly, that no money would be disbursed unless and until an administrative exemption was granted

and, if not granted, that the loan contract would be null and void. Such a loan contract would be valid and wholly consistent with ERISA's prohibited transaction rule.

38. Also, in the instant case, M & R could have attempted to persuade the Trustees of the Fund to hold the loan contract of March 10, 1975, in abeyance while M & R sought an administrative exemption. M & R did not choose to do so, apparently content to rely on its position that the divestiture would remove the taint, but more likely because M & R knew that the prospects of obtaining a favorable administrative exemption were poor.

39. Plaintiff's argument that the Pension Fund breached an implied agreement to seek and obtain an administrative exemption under ERISA § 408(a) is without factual or legal support. ERISA § 408(a) provides a means for exempting or immunizing otherwise violative conduct involving parties in interest; the exemption procedure requires an application, formal notice, opportunity for comment, and a determination by the Secretary of Labor that the exemption is "in the interests of the plan and of its participants and beneficiaries." Title 29 U.S.C. § 1108(a). Here, it is undisputed that neither party sought or obtained an exemption to enter into the prohibited transaction. Nor is there evidence that M & R, which itself could have sought an exemption, see ERISA Proc. 75–1, § 3.02(1), 40 Fed.Reg. 18471 (1975), was prevented from doing so by the Pension Fund. In view of the per se operation of ERISA § 406 absent an administrative exemption, see *Cutaiar v. Marshall*, 590 F.2d 523, 529–30 (3d Cir. 1979), and the admitted lack of such an exemption, the Court finds the loan contract to be unlawful and unenforceable.

40. Assuming, arguendo, that the oral discussions or oral agreements between the Penasquitos Committee of the Pension Fund and Shenker, between the date of the death of Irwin J. Kahn on September 10, 1973, and February 22, 1974, relative to a loan from the Pension Fund to Shenker for $40 million to build a 1,000-room addition to the Dunes Hotel, were sufficient, which

they were not, to create a legally binding loan contract, the integration clause, paragraph 12.6 of Exhibit 15, the agreement of February 22, 1974, between Shenker and the Pension Fund would, under the parol evidence rule, bar proof of the same.

41. Furthermore, the statute of frauds bars any reliance by the plaintiff upon the said oral discussions and oral agreements and upon any other oral discussions and oral agreements between September 10, 1973, and July 1, 1974, the effective date of ERISA's bar date.

42. The Pension Fund was not under any duty to seek, or to assist plaintiff in seeking, an exemption from ERISA, due to any contractually implied covenants of good faith and fair dealing and of cooperation; and in any event, the Pension Fund did not violate any such implied covenants.

43. The Pension Fund is not estopped to assert either ERISA or any contractual conditions precedent not performed by plaintiff.

44. Either the Pension Fund or M & R could have unilaterally and lawfully rescinded the loan contract at any time after it was made on March 10, 1975, and this continued to be true until the Fund did in fact rescind the loan contract in June 1976 and would have continued to be true until this date, had there not been a rescission in June of 1976, because an administrative exemption was never granted.

45. Plaintiff's final defense, that a recent class exemption under ERISA § 408(a) is available, is based upon a misreading of the exemption. The exemption is captioned, "Class Exemption for Certain Transactions Authorized or Required by Judicial Order or Judicially Approved Settlement Decree." 44 Fed.Reg. 26979 (May 8, 1979); see also 44 Fed.Reg. 7244 (Feb. 6, 1979) (notice of proposed class exemption). The class exemption provides:

"Sections 406 and 407(a) of the Act and section 4975(a) and (b) of the Code shall not apply with respect to any transaction or activity which is authorized or required, prior to the occurrence of such transaction or activity, by an order of a United States District Court or by a settlement of litigation approved by such a court, provided that the nature of such transaction or activity is specifically described in such order or settlement, and provided further that the Secretary of Labor or the Internal Revenue Service is a party to the litigation at the time of such order of settlement."

It is designed to facilitate the implementation of court orders or court-approved settlements prospectively authorizing conduct otherwise prohibited by ERISA, where either the Department of Labor or the Internal Revenue Service has been a party to the litigation. The class exemption, however, is limited by its terms to a transaction or activity which a court orders *prior to the occurrence of such transaction or activity.* 44 Fed.Reg. 26979 (1979) (emphasis supplied). Given the explicit limitation of the exemption to prospective transactions, and the incontrovertible fact that the contractual commitment which plaintiff seeks to enforce has already been entered into, the Court holds the judicial order exemption to be unavailable to plaintiff. Use of the exemption to authorize or direct performance of the M & R loan commitment would violate the letter and spirit of the class exemption and also undermine the administrative exemption mechanism of ERISA § 408(a).

46. The plaintiff's claim for specific performance of the loan contract must be and hereby is denied.

Let judgment be entered accordingly.

### JUDGMENT

This Court, having granted defendants' motions for involuntary dismissal under Rule 41(b), FRCP, as to the issue of liability in this lawsuit, and having stated its findings of fact and conclusions of law, now enters judgment in favor of the defendants and against the plaintiff on the issue of liability in this lawsuit.

Further, having this day administratively dismissed under Rule 41(b) plaintiff's demand for trial to a jury of the issue of damages in this lawsuit, this Court now enters judgment in favor of the defendants and against the plaintiff on the issue of

damages. Judgment is thus entered in favor of the defendants and against the plaintiff on both plaintiff's claims for relief as alleged in Counts I and II of the complaint.

Further, assuming arguendo that plaintiff had the right to a jury trial of its second claim alleged in Count II of the complaint, this Court having this day granted summary judgment to defendants and against plaintiff because, based upon this Court's findings of fact and conclusions of law of January 14, 1980, there are no genuine issues of material fact, the Court now enters summary judgment in favor of the defendants and against the plaintiff on plaintiff's second claim.

Although there remains pending before the Court the defendants', former Trustees, counterclaim against the plaintiff for attorneys' fees, this Court has determined, in accordance with Rule 54(b), FRCP, that this judgment should be entered now and that there is no just reason for delay in entry of this judgment.